## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DARREN WALTON on behalf of himself and
all others similarly situated,

                Plaintiff,

v.

GRAMMER INDUSTRIES, INC. a South
Carolina corporation,

                Defendant.

CASE NO. _____

**CLASS ACTION**
**JURY TRIAL DEMANDED**

---

## CLASS ACTION COMPLAINT

Plaintiff Darren Walton files this class action complaint on behalf of himself and all others similarly situated against Defendant Grammer Industries, Inc. ("Grammer"), and alleges:

### I.      INTRODUCTION

1. For more than a decade, Defendant Grammer has been manufacturing headrests for certain model Chrysler vehicles which exhibit a defect that threatens occupants' safety. Embedded in the headrest is a mechanism, known as an "active head restraint" ("AHR"), which is designed to spring forward upon a rear-end collision and rapidly push the headrest out to catch the occupant's head and prevent whiplash. A critical component of the AHR is composed of cheap, weak plastic. As a result, the Grammer AHRs deploy suddenly, and without warning, in the absence

1

12E4531

of an impact from an external force, and forcefully strike the back of the occupant's head. The force of the impact can cause serious bodily harm, and creates a risk of collision should the headrest deploy while the vehicle is being driven.

2.    The AHR spontaneously deploys when, under normal operating conditions, a cheap plastic bracket restraining the device fails. The plastic bracket that acts as the triggering mechanism for the AHR and holds a spring-loaded release in place until a sensor signals a rear-end collision.  As a cost-saving measure, Defendant designed this bracket with an inferior and inexpensive plastic which wears down over time under the constant pressure exerted by the springs in the AHR. There are millions of Chrysler vehicles equipped with the defective Grammer AHR in the United States, and there is no way for a vehicle owner to predict when the AHR in the headrest will deploy.

3.    The defective AHR is a "safety-related defect," as defined by the National Highway and Traffic Safety Administration (NHTSA).  Specifically, NHTSA states that examples of defects related to safety include:

> Car seats and booster seats that contain defective safety belts, buckles, or *components* that create a risk of injury not only in a vehicle crash, but also in the nonoperational safety of a motor vehicle.[1] (emphasis added).

---

[1] *See* https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/14218-mvsdefectsandrecalls_041619-v2-tag.pdf

2

4.      NHTSA also defines safety-related defects to include "[s]eats and/or seat backs that fail unexpectedly during normal use."[2]

5.      In fact, NHTSA opened an investigation into the Grammer AHRs in Chrysler vehicles on September 9, 2019, entitled "Active Headrest Inadvertent Deployment," in which NHTSA is reviewing the reports of AHRs posing a safety hazard through their inadvertent deployment. *See* NHTSA Preliminary Evaluation 19-014.

6.      Information regarding the defective AHR and the safety hazard it poses to vehicle occupants was, until recently, in the exclusive possession of Grammer and Chrysler and was not provided to Plaintiff or any class member. Neither Plaintiff nor absent class members could have reasonably discovered the defect through due diligence.

7.      Grammer became aware of this safety defect no later than 2010 based on, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, plastic material data reports, and consumer complaints to NHTSA. Grammer was intimately involved in the design and testing of the AHR

---

[2] Motor Vehicles and Safety Defects:  What Every Owner Should Know, *available at* https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm (last visited on 12/12/2019).

12E4531

systems and was aware that they were designed with an inferior, inexpensive, plastic that cannot withstand the constant force applied by the springs.

8.      Chrysler was similarly aware of the defect. Consumers lodged complaints on public internet forums and with Chrysler. Chrysler also collected aggregate warranty data, repair orders, and parts data from its dealerships. On information and belief, Chrysler shared this information with Grammer.

9.      Grammer is further aware of the defect because the same defective AHR system, which an affiliate Grammer company manufactures and sells, has been the subject of numerous incidents involving Mercedes-Benz vehicles.[3]

10.     Despite this exclusive and superior knowledge, Grammer continued to design and manufacture the defective AHR for use in Class Vehicles, and has taken no action to correct the problem.

11.     Consumers rely on manufacturers of automobiles and their component parts to design, manufacture, market, and sell vehicles that are safe and protect against the risk of bodily injury.  Consumers do not expect these manufacturers to make or install products that increase the risk of injury or malfunction while the vehicle is in ordinary use.  When Plaintiff and absent class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that

---

[3] *See Lewis et al. v. Mercedes-Benz USA, LLC, et al.*, Case No. 19-cv-81220-RAR (S.D. Fla.).

12E4531

the Class Vehicles would be free from defects and that Grammer would not design and manufacture the AHR with an inherent safety risk to occupants simply to enrich itself through a cost-saving measure.

12. As a direct result of the defective AHR and Defendant's fraudulent concealment thereof, Plaintiff and all absent class members did not receive the benefits of their bargains and have been harmed and suffered actual damages, including overpayment for their Class Vehicles, loss of use of their Class Vehicles, costs and lost time associated with bringing in their Class Vehicles for diagnosis, repair, and replacement of components, and the actual costs of diagnosis, repair, and replacement components to address or repair the defective AHR.

13. This lawsuit seeks to compel Grammer to notify owners of all affected vehicles of the defect in the AHR; to replace the defective and dangerous headrests; and to compensate Class members for their losses arising from the defect.

14. The Chrysler vehicles equipped with headrests containing the defective AHR are referred to herein as the "Class Vehicles." Each of the Class Vehicles has the same AHR headrest and contains the same defect. The model years and makes of the Class Vehicles include[4]:

2010-2018 Dodge Journey;

2010-2011 Dodge Nitro;

---

[4] Discovery in this matter may reveal additional vehicles containing the defective AHR.

2010-2012 Jeep Liberty;

2010-2017 Jeep Patriot or Compass;

2010-2012 Dodge Caliber;

2010-2018 Dodge Caravan;

2011-2018 Dodge Ram C/V

2011-2018 Dodge Durango;

2011-2018 Jeep Grand Cherokee;

2010-2014 Sebring/Avenger;

2011-2018 Chrysler Town & Country;

2011-2018 Chrysler 200; and

2011-2018 Chrysler 300

## II.   PARTIES, JURISDICTION, AND VENUE

**Plaintiff**

### *Darren Walton*

15.    Plaintiff Darren Walton is a Pennsylvania citizen residing in Greley, Pennsylvania.  He is a natural person over the age of twenty-one, and otherwise *sui juris*.

16.    Mr. Walton owns a certified pre-owned 2014 Jeep Grand Cherokee, which he purchased from Milford Chrysler in Milford, Pennsylvania in 2016. This dealership operates as an agent of Chrysler.  Mr. Walton's Class Vehicle is equipped

6

with headrests containing the defective AHR.

17.     When Plaintiff Walton purchased his Class Vehicle, he was unaware that it contained the defective AHR. Plaintiff Walton bought his vehicle, and paid a premium price, because he trusted Chrysler to provide high-quality and safe automobiles.  Prior to purchasing the vehicle, Plaintiff Walton was aware of, reviewed, or heard Chrysler's warranties and advertisements publicizing its reputation for safety and reliability. These materials and advertisements did not disclose either that Chrysler had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use. The value of Mr. Walton's vehicle has been diminished as a result of the defective AHR.  Had Plaintiff Walton known of the AHR defect, he would not have purchased the vehicle or would not have paid as much for it as he did.

18.     The AHR in Plaintiff Walton's 2014 Jeep Grand Cherokee deployed without warning in June 2020. Plaintiff Walton's wife was driving the vehicle with their teenage daughter in the passenger seat when the passenger-side AHR spontaneously deployed and struck his daughter in the back of the head. The AHR's spontaneous deployment caused Mr. Walton's daughter to suffer pain, neck stiffness, and headaches. However, the family did not bring their daughter to the hospital due to concerns regarding COVID-19.

19.     Mr. Walton contacted Chrysler regarding the spontaneous deployment

12E4531

and took his vehicle to Milford Chrysler, where he met a Chrysler representative who inspected the vehicle and took various pictures and measurements of the broken AHR. The Chrysler representative informed Mr. Walton that the headrest could not be returned to its original position because a plastic component was broken. The representative did not disclose the defect in the AHR to Mr. Walton; that is, he did not disclose that the spontaneous deployment was caused by the cheap, inferior plastic that Defendant Grammer had used to manufacture the AHR.

20.    After the inspection of his vehicle, Mr. Walton was told by Milford Chrysler that because his car was out of warranty it would cost approximately $800 to replace the headrest. The Chrysler representative told Mr. Walton that Chrysler would let him know within thirty days if Chrysler would replace the headrest free of charge. Chrysler never contacted Mr. Walton and he has since placed several calls to Chrysler to find out if they intend to fix the problem, but Chrysler has not responded.

**Facts Applicable to Plaintiff and All Class Members**

21.    Neither Grammer nor Chrysler ever disclosed the existence of a defect in the AHRs to consumers. Had Grammer or Chrysler disclosed that the Class Vehicles' AHR exhibited a known safety defect, Plaintiff and absent class members would have not purchased or leased their Class Vehicles, or they would have paid significantly less for them.

12E4531

22.     When Plaintiff and absent class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an AHR that was free from defects, safe to operate, and would not pose a threat to their safety or the safety of occupants or other drivers. In fact, Chrysler has always emphasized the quality and reliability of the Class Vehicles, knowing that consumers, including Plaintiff and Class members, rely upon such representations when purchasing or leasing vehicles.

23.     Grammer had a duty to disclose the AHR defect because the defect poses a known safety hazard, and can cause serious bodily harm or even death. Had Grammer or Chrysler disclosed that the defective AHR in the Class Vehicles could spontaneously and dangerously deploy during normal use of the car, posing a safety hazard to vehicle occupants and other drivers, Plaintiff and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

24.     Plaintiff and members of the putative class operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used. Plaintiff and the class members have suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of common law and statutory duties, and omissions and misrepresentations relating to the defective AHR and its associated safety hazard, including but not limited to, out-of-pocket losses

9

and diminished value of their vehicles.

25.     There are no material differences between Plaintiff's circumstances and those of absent class members. Each Plaintiff and putative Class member owns or leases a Class Vehicle with the defective AHR.  Each Plaintiff and putative class member was similarly damaged because they did not receive the benefits of their bargains and purchased or leased Class Vehicles that are of a lesser standard, grade, or quality than represented or expected. Grammer possessed superior and exclusive knowledge of the AHR design and knew, should have known, or recklessly disregarded the fact that the AHR system in the headrests were defective and posed a serious safety hazard. Grammer concealed this knowledge from the public, Plaintiff, and the putative class members.

26.     Each Plaintiff and putative Class member was deprived of having a defect-free headrest installed in their vehicle and Grammer has been, and is being to this day, unjustly enriched from its unconscionable delay in disclosing the defect, repairing or replacing the headrests, and issuing a recall on the defective AHR headrests.

**Defendant**

***Grammer***

27.     Defendant Grammer Industries, Inc. is a South Carolina for-profit corporation with its principal place of business in Troy, Michigan. Grammer

12E4531

develops and manufactures automotive interior components including headrests, armrests, and center consoles which automobile manufacturers like Chrysler then install in their vehicles that are sold in this District and throughout the United States.

28.     Grammer manufactures the headrests that include the defective AHR and supplies them to Chrysler for installation in the Class Vehicles. Grammer supplied these headrests to Chrysler with the intent and knowledge that such headrests would be equipped in Class Vehicles for sale in this District and throughout the United States.

**Relevant Non-Party**

*Chrysler*

29.     FCA US LLC is the U.S. subsidiary of Italian multinational automaker Fiat, S.p.A. FCA US LLC is formerly known as Chrysler Group, LLC. It is in the business of designing, testing, manufacturing, marketing, selling, and supporting the Class Vehicles that are the subject of this complaint. It does business nationwide. FCA US LLC is referred to herein as "Chrysler."

30.     Chrysler approved and installed the defective AHR in the Class Vehicles and approved and publicized marketing and advertising designed to sell the Class Vehicles as equipped with an AHR as a "standard and effective safety feature."

31.     There are approximately 2,640 authorized Chrysler dealerships in the United States. In 2018 alone, Chrysler sold more than two million vehicles,

11

including Class Vehicles, in the United States.

32.   Chrysler contracts with Grammer to purchase the defective AHRs that are the subject of this Complaint. Consumers are foreseeable third-party beneficiaries of those contracts, as Grammer manufactures the AHRs with the intent that Chrysler will sell them to consumers.

**Jurisdiction and Venue**

33.   This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Grammer's home states of South Carolina and Michigan.  Upon information and belief, the total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs. Jurisdiction is also proper in this Court under 28 U.S.C. § 1331 because Plaintiff brings a federal Magnuson-Moss claim. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

34.   This Court has personal jurisdiction over Grammer pursuant to Michigan Comp. Laws § 600.711(3) because Grammer has its principal place of business in Troy, Michigan, and thus carries on a continuous and systematic part of its general business within the state.

35.   Venue is proper in this forum pursuant to 28 U.S.C. § 1391 as Grammer resides in this district and is the only defendant to this action.

36.     All conditions precedent to this action have occurred, been performed, or have been waived.

## III.    FACTUAL ALLEGATIONS

**Background**

37.     Since 2010, Grammer has supplied Chrysler with headrests containing the defective AHR. Grammer and Chrysler had exclusive and superior knowledge that the inexpensive plastic used in the AHR could not withstand the constant pressure being applied by the tensed springs and would fail under ordinary use but failed to disclose this information to Plaintiff and Class members. Consumers, relying on Chrysler's longstanding self-promoted reputation for quality vehicles, paid heightened prices for Class Vehicles that pose a serious and unpredictable risk of injury to drivers, occupants, and the general public because of the defective AHR manufactured by Grammer.

38.     The AHR is marketed as a critical safety device for preventing or reducing head and neck injuries, such as whiplash, during rear-end collisions.  It is designed to propel the headrest forward, towards the head, to cushion and arrest the abrupt backward movement of the driver or passenger head after impact.

39.     The internal components of the defective AHR are the same across all Chrysler Class Vehicles: the forward-facing padded surface of the headrest is mounted to a plastic carriage that is loaded by pre-tensioned springs when stowed in

the headrest prior to deployment. The carriage is secured in the stowed position by a pin-and-hook latch assembly. The pin is secured in a nest in the carriage and the latch, in turn, is linked to the vehicle's electronic computer control unit.  When the control unit detects a rear-end collision exceeding some threshold of severity, a signal triggers the pin-and-hook latch to release the pin allowing the carriage to be forced forward by the springs, rapidly deploying the face of the headrest forward. Below is an illustration of the AHR system before it has deployed:



40.     When a vehicle is involved in a rear-end collision, the device propels the face of the headrest forward by 40 millimeters and upwards by 30 millimeters, to meet the head as it travels backwards. The device fully deploys in .027 seconds. This is known as a commanded deployment, and is the intended function of the AHR

41.     However, rather than operating as intended, the defective AHR poses a

12E4531

serious risk of harm because it is substantially certain to malfunction and deploy (and strike the occupant of the seat) when the vehicle is in normal use and in the absence of a rear-end collision. The crucial internal component that restrains the AHR is the plastic carriage that is secured by the latch pin against the force of the compressed springs.  As a cost-saving measure by Defendant, the bracket keeping the pin in place, until a rear-end collision is sensed, is made from a low-quality, inexpensive, plastic called Acrylonitrile Butadiene Styrene, or ABS. The two linear springs combine to exert 75 pounds of force on the ABS plastic bracket at all times, and cause the ABS comprising the bracket to weaken over time through normal use.

42.     As early as 2010, Grammer had exclusive and superior knowledge, but did not disclose, that this particular plastic cannot withstand this constant pressure and is prone to cracking and breaking, allowing the pin to be released from the carriage, rather than from the latch, and spontaneously deploying the headrest even when the vehicle has not been involved in a rear-end collision. The image below illustrates an uncommanded deployment of the AHR system after the plastic has broken.



43.    When the plastic breaks down, the carriage deploys at random—rather than only in a rear-end collision—suddenly striking the driver or passenger in the back of the head. The AHR deploys the headrest at a rate of 12 miles per hour, or nearly 18 inches per second, impacting the back of the passenger's head with enough force to cause injuries.[5]   The uncommanded deployment can occur at any time, including while the vehicle is driving on highways or public roads.

44.    Inspection of headrests in which the defective AHR has randomly

---

[5] *See e.g.*, https://www.nbclosangeles.com/investigations/randy-responds/chrysler-recall-jeep-headrest-concussion/170325/ (December 3, 2018, news report out of California regarding a 2014 Chrysler Town and Country minivan that spontaneously deployed and gave the vehicle owner a concussion).

12E4531

deployed reveals that the AHR will deploy when *not* commanded by the vehicle's computer sensor. The latch and pin assembly remains engaged, but when the plastic bracket that holds the pin fails and breaks under the strain of the pent-up spring tension, it causes the springs to release and deploy the AHR *without* the hooks releasing the pin.

45. One can determine, through visual inspection, whether a deployment was commanded or uncommanded.  Because the hooks retract in a commanded deployment, an intact hook-and-pin assembly (as well as the broken plastic) indicates that an uncommanded deployment has occurred.

46. No reasonable consumer expects to purchase or lease a vehicle with a defective AHR that exposes them to a serious safety hazard. Further, Plaintiff and absent class members did not reasonably expect Grammer (or Chrysler) to conceal a defect in the Class Vehicles or conceal a known safety hazard. Plaintiff and the unnamed Class members had no reasonable way to know that Class Vehicles contained the defective AHRs, which were defective in materials, design, and manufacture, and posed a serious and real safety hazard.

47. As a result of Grammer's material omissions, as set forth herein, including its failure to disclose that the Class Vehicles contain a defective AHR, Plaintiff and members of the putative class paid more for their Class Vehicles than they otherwise would have and suffered other actual damages, including but not

limited to out-of-pocket expenses and the diminished value of their vehicles. The defective AHR in the headrests manufactured by Grammer makes the Class Vehicles unsafe to drive. Plaintiff and putative class members would not have purchased or would have paid less for the Class Vehicles had they known of the defect.

**Grammer AHRs Have a Common Uniform Defect**

48.     Grammer manufactures headrests with the defective AHR that Chrysler installs in the Class Vehicles. As discussed above, the plastic bracket in the AHR is made from Acrylonitrile Butadiene Styrene (ABS). ABS is a lightweight, recyclable, thermoplastic polymer with relatively cheap production costs. ABS is frequently used for inexpensive consumer products, such as children's toys, kitchen utensils, and faceplates for electric outlets.

49.     ABS is unsuitable for use in the AHR as it does not withstand fatigue well. The resistance to the stored potential force of the two compressed springs in the AHR creates continuous pressure which, over time, inevitably leads to what is known as a "plastic creep" and eventually to cracking and component failure. ABS is prone to tell-tale "stress-whitening," where the plastic creep and cracking is occurring, allowing one to see where the plastic's integrity has been compromised and where the plastic will break.

50.     The ABS plastic will break solely due to the force of the springs but is even more susceptible to failure in severe hot or cold weather.

18

51.     What is even more egregious about the use of this inexpensive and inferior ABS plastic is that other components of the headrest were designed with a fiber-glass reinforced plastic, which is much stronger and more durable (but also more expensive) and capable of withstanding the constant force of the springs.

52.     Despite its awareness of the safety issues caused by a sudden and unexpected AHR deployment, being further aware of plastic material that should have been used in the design, and being on notice that the AHR exhibits a dangerous safety defect, Grammer has refused to warn customers, issue a recall, or take responsibility for repairing or replacing the AHR headrests in the Class Vehicles. Instead, Both Grammer and Chrysler concealed the fact and nature of the defect from Plaintiff, putative class members, and the public and continue to manufacture and distribute the defective AHR.

**Grammer's Knowledge of the AHR Defect and Associated Safety Hazard**

53.     Based on engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, consumer complaints to NHTSA, consumer complaints to dealerships, consumer complaints on website forums, aggregate warranty data compiled from Chrysler dealerships, and repair orders and parts data received from dealerships, amongst other things, Grammer has known since at least 2010 that the AHR was made with an inferior plastic that could

not withstand the pressure it was exposed to and would prematurely fail during normal use of the vehicle.

54.     In addition, upon information and belief, Grammer became aware of this safety defect after conducting its own investigation into the reports and cause of the spontaneous deployments.

55.     Grammer, Chrysler, and their agents possessed this exclusive and superior knowledge and information regarding the defective AHR but intentionally concealed the defect and its associated safety hazard from Plaintiff and absent class members.

56.     Grammer knew or should have known that the AHR defect and its associated safety hazards were material to owners and lessees of the Class Vehicles and that Plaintiff and absent class members did not know about, or could not reasonably discover, the AHR defect before they purchased or leased Class Vehicles or before the warranties on their Class Vehicles expired.

57.     Notwithstanding Grammer's and Chrysler's exclusive and superior knowledge of the defective AHRs, neither disclosed the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter), and they continued to install the defective AHRs in certain Class Vehicles up and until 2018 models. Grammer knowingly and intentionally concealed the AHR defect and associated safety hazard and failed to provide any notice of the defect and associated

safety hazard to Plaintiff and absent class members. Additionally, no attempt was made to recall the Class Vehicles or otherwise remedy the AHR defect.

### NHTSA Complaints

58.   Consumers who purchased or leased Class Vehicles have filed hundreds of complaints with NHTSA, reporting and detailing the defective AHR in the Class Vehicles and ultimately resulting in NHTSA opening an investigation into the AHRs in Class Vehicles.

59.   Federal law requires Chrysler and other vehicle manufacturers to monitor defects that can cause a safety issue and report them within five days to NHTSA.  On information and belief, through its relationships with Chrysler and Mercedes, Grammer was aware of NHTSA complaints about the defective AHR.

60.   As detailed above, Defendant's AHR headrests were designed and manufactured with an inferior and inexpensive plastic and, as can be seen by consumer complaints made to NHTSA, have created issues with uncommanded deployments for years [all sic]:

> a.   **Consumer Complaint – NHTSA ID Number: 10925749**
> **2013 Dodge Journey**
> **Date Complaint Filed: 11/14/2016**
> **Date of Incident: 09/28/2016**

> ON SEPTEMBER 28 2016 2:30 PM RIDING NORTH ON HWY 59 FROM KINGWOOD WE HAD JUST PASSED THRU SHEPPARD TX. WE HAD BEEN ON CRUISE AT 70 MPH SINCE CLEVELAND TX WHEN WE HEARD A LOUD EXPLOSION. MY HEADREST HAD EXPLODED AND PUSHED MY HEAD FORWARD FAST. MY HUSBAND WAS DRIVING

AND HE THOUGHT I HAD BEEN SHOT BY A STRAY BULLET THE
WAY MY HEAD BOLTED FORWARD.

b.    **Consumer Complaint – NHTSA ID Number: 11000632**
      **2014 Dodge Durango**
      **Date Complaint Filed: 06/22/2017**
      **Date of Incident: 06/20/2017**

MY DRIVER SIDE HEADREST DEPLOYED ON ITS OWN WHILE
DRIVING DOWN THE ROAD. THE VEHICLE HAS NEVER BEEN IN
AN ACCIDENT AND IT IS ONLY 3 YEARS OLD. THE DEPLOYMENT
ALMOST CAUSED ME TO WRECK BUT I WAS ABLE TO MAINTAIN
MY VEHICLE TO COME TO A STOP IN THE OTHER LANE. I HAVE
CONTACTED THE DEALER AND DODGE WITH NO HELP. THERE
EQUIPMENT MALFUNCTION AND I HAVE TO PAY $684 TO HAVE IT
REPAIRED. KEEP IN MIND IT IS SUPPOSE TO DEPLOY IN A REAR
END COLLISION AND THERE WAS NO COLLISION. IT WAS A
SPONTANEOUS DEPLOYMENT.

c.    **Consumer Complaint – NHTSA ID Number: 11101699**
      **2013 Dodge Journey**
      **Date Complaint Filed: 06/13/2018**
      **Date of Incident: 06/08/2018**

THE ACTIVE HEADREST HAS FAILED. I INITIALLY THOUGHT IT
WAS DEPLOYED, BUT AFTER ATTEMPTING TO RESET THE UNIT, I
NOTICED THE SILVER PIN THAT WAS DESIGNED TO HOLD THE
HEADREST IN POSITION WAS LOOSE. THE SMALL PIECES OF
PLASTIC THAT HELD THIS IN PLACE HAVE COMPLETELY BROKEN
LOOSE, THUS DEPLOYING THE HEADREST. CLOSING THIS BACK
INTO POSITION IS NOW IMPOSSIBLE.

I CONSIDERED ORDERING A REPLACEMENT PART, BUT WHY
SHOULD I BUY SOMETHING THAT IS LIKELY TO FAIL?

I CALLED THE DEALER TO SEE WHAT THEY WOULD CHARGE TO
FIX THIS FOR ME, AFTER BEING QUOTED $192 IN LABOR, I
DECIDED THAT THEY WOULD NOT BE HELPING ME WITH THIS.

I'M GLAD THIS DID NOT SLAP ME IN THE BACK OF THE HEAD

12E4531

WHILE I WAS DRIVING. THIS COULD VERY WELL KNOCK A DRIVER UNCONSCIENCE, OR CAUSE HIM OR HER TO LOSE CONTROL OF THE VEHICLE. IT IS MY OPINION THIS NEEDS TO BE EXAMINED BEFORE SOMEONE IS KILLED, OR DO WE HAVE TO WAIT FOR THAT TO HAPPEN BEFORE A RECALL IS ISSUED?

MY VEHICLE WAS STATIONARY. I FOUND THE HEADREST OPEN WHEN I OPENED THE DOOR TO GO TO WORK.

I WOULD BE MORE THAN HAPPY TO DISCUSS THIS FURTHER. I CAN GET PHOTOS OF THE BROKEN HEADREST, I'M AT WORK AT THE MOMENT, BUT I CAN TAKE PICTURES TONIGHT AND UPLOAD TOMORROW IF NEED BE.

d.   **Consumer Complaint – NHTSA ID Number: 11120869**
     **2014 Dodge Caravan**
     **Date Complaint Filed: 08/19/2018**
     **Date of Incident: 04/01/2018**

WHILE DRIVING, THE VEHICLE ACTIVE HEAD RESTRAINT DEPLOYED, ON ITS OWN, PUSHING MY HEAD FORWARD. NO COLLISION HAD OCCURRED AT THE TIME OF DEPLOYMENT. THE HEAD RESTRAINT LOOKS AS IF THE PLASTIC BRACKET INSIDE BROKE BECAUSE I TRIED RESETTING THE HEAD RESTRAINT, PER MANUFACTURER INSTRUCTIONS, BUT IT WILL NOT RESET. HEAD RESTRAINT NEEDS TO BE REPLACED WITH A NEW PART.

e.   **Consumer Complaint – NHTSA ID Number: 11120869**
     **2014 Dodge Caravan**
     **Date Complaint Filed: 01/22/2018**
     **Date of Incident: 01/21/2018**

DRIVER'S HEADREST DEPLOYED DUE TO THE PLASTIC THAT HOLDS A PIN BROKE INTERNALLY. THIS SPRING LOADED SYSTEM APPARENTLY HAD ENOUGH TENSION THAT IT BROKE THE PLASTIC. MY VEHICLE WAS STATIONARY AND UNOCCUPIED AT THE TIME. IF I HAD BEEN SITTING IN THE VEHICLE MY NECK COULD HAVE BEEN BROKEN. A REPLACEMENT HEADREST IS ABOUT $650, NOT INCLUDING LABOR, ACCORDING TO THE DEALERSHIP AND I WAS TOLD IT IS NOT IN WARRANTY. I HAVE

12E4531

HAD THIS VEHICLE LESS THAN 4YRS.

   f.    **Consumer Complaint – NHTSA ID Number: 11218697**
         **2013 Dodge Journey**
         **Date Complaint Filed: 06/08/2019**
         **Date of Incident: 05/02/2019**

PASSENGER FRONT SEAT HEADREST DRIVING DOWN THE ROAD
THE HEADREST SHOT OPEN STRIKING MY WIFE IN THE BACK OF
THE HEAD FOR NO APPARENT REASON. I HAVE READ OTHER
ISSUES OTHER PEOPLE HAVE EXPERIENCED SAME PROBLEM.
THIS IS DANGEROUS AND NEEDS TO BE ADDRESSED BEFORE A
ACCIDENT HAPPENS AND SOMEONE GETS KILLED. I THINK
DODGE SHOULD BE RECALLING THESE VEHICLES FOR THESE
ISSUES.

   g.    **Consumer Complaint – NHTSA ID Number: 11235208**
         **2013 Dodge Journey**
         **Date Complaint Filed: 07/26/2019**
         **Date of Incident: 07/26/2019**

I WAS DRIVING ALL THE SUDDEN I HEAR THIS POP SOUND MY
HEADREST BUSTED OPEN THE PLASTIC BROKE INSIDE. I HAVE
READ LOOKED UP THAT IT HAS HAPPEN TO A LOT OF PEOPLE.

   h.    **Consumer Complaint – NHTSA ID Number: 11282652**
         **2016 Jeep Patriot**
         **Date Complaint Filed: 11/27/2019**
         **Date of Incident: 11/25/2019**

ACTIVE HEADREST WAS DEPLOYED/ACTIVATED WHILE IDLE AT
A RED LIGHT, THE HEADREST HIT THE BACK OF MY HEAD AND
MADE ME RELEASE THE BRAKE WHILE STOPPED AT A RED
LIGHT, THERE WAS ALSO A VERY LOUD NOISE (KIND OF LIKE A
GUN SHOT NOISE). THIS WAS VERY SCARY AS I HAD NO IDEA
WHAT HAD HAPPENED OR WHAT HAD HIT MY HEAD, I HAD TO
PULL TO THE SIDE OF THE ROAD AND EXAMINE MY CAR TO
MAKE SURE IT WAS SAFE TO DRIVE IT. ALL THIS WHILE I WAS IN
PAIN RESULTING FROM THE HEADREST HITTING THE BACK OF
MY HEAD.

12E4531

i.    **Consumer Complaint – NHTSA ID Number: 11140239**
      **2016 Jeep Patriot**
      **Date Complaint Filed: 10/14/2018**
      **Date of Incident: 10/04/2018**

DRIVER'S SIDE ACTIVE HEADREST SELF-DEPLOYED. VEHICLE
WAS STATIONARY AND PARKED OVER NIGHT IN GARAGE.
PLASTIC RETAINER FRACTURED LEADING TO DEPLOYMENT.

j.    **Consumer Complaint – NHTSA ID Number: 11300648**
      **2015 Jeep Grand Cherokee**
      **Date Complaint Filed: 01/21/2020**
      **Date of Incident: 12/02/2019**

I WAS DRIVING ONE DAY WHEN SUDDENLY I WAS STRUCK
EXTREMELY HARD ON THE BACK OF MY HEAD. SO HARD THAT I
THOUGHT I GOT INTO AN ACCIDENT, ALTHOUGH I DIDN'T I
ALMOST CAUSED AN ACCIDENT. MY HEAD AND NECK WERE
HURTING FOR A WHILE, WHEN I PARKED MY VEHICLE I
REALIZED THAT MY HEADREST HAD POPPED OUT. NOT SURE
WHY THIS HAPPENED BUT WHEN I WENT TO RESEARCH THIS
PROBLEM I NOTICED THAT A LOT OF PEOPLE HAVE BEEN
COMPLAINING ABOUT AHR RANDOMLY BREAKING AND DUE TO
THE FACT THAT IT ALMOST CAUSED AN ACCIDENT AND HOW
HARD I GOT HIT I BELIEVE THAT THIS IS A CAUSE FOR CONCERNS
AND AN UNSAFE CONDITION. I TOOK MY CAR BACK TO THE
DEALERSHIP AND THEY TOLD ME THE WARRANTY WOULDN'T
COVER THIS NOR WAS THEIR ANY RECALL ON MY VEHICLE. I
DUG A LITTLE DEEPER INTO THIS MATTER AS I SAW HOW MANY
COMPLAINTS THERE WERE AND SAW THAT THIS ISN'T THE FIRST
TIME THIS VEHICLE HAS HAD THIS PROBLEM AND THE FACT
THAT THERE IS A HISTORY SHOULD AT LEAST CAUSE AN
INVESTIGATION. WITH ALL THAT BEING SAID, THANK YOU IN
ADVANCE FOR YOUR ATTENTION TO THIS MATTER AND HAVE A
NICE DAY.

12E4531

k.    **Consumer Complaint – NHTSA ID Number: 11020593**
      **2015 Jeep Grand Cherokee**
      **Date Complaint Filed: 08/30/2017**
      **Date of Incident: 08/19/2017**

THE PASSENGER SEAT HEAD RESTRAINT SYSTEM ACTIVATED FOR NO KNOWN REASON WHILE DRIVING 70 MPH ON THE INTERSTATE. THE VEHICLE WAS NOT IN ANY ACCIDENT OR NO FACTORS CAUSED THIS. THE HEAD REST VIOLENTLY SHOT FORWARD APPROX 6" IF THIS WOULD HAVE BEEN THE DRIVERS SEAT IT WOULD ALMOST CERTAINLY CAUSED THE DRIVER TO LOOSE CONTROL OF THE JEEP.

### *Consumer Complaints*

61.    Chrysler vehicle owners have also shared their experiences with the

AHR defect on websites devoted to Chrysler vehicles, which, upon information

and belief, Grammer is aware of and regularly reviews.  Examples of these

consumer complaints include [all sic]:

- My 2015 Jeep Patriot Driver side headrest deployed and shot plastic all over the place. Luckily no[] one was hurt.[6]

- I got in my Jeep yesterday after it being parked in the driveway overnight, to notice that the active headrest on the passenger side was sticking out. After closer inspection, I came to find that the tabs at the top of the headrest were broken so it cannot be re-engaged. [ ] I'm glad that it didn't happen to the driver side while my wife or I was driving. I'm sure it would have caused us to wreck with something smacking into the back of our heads unexpectedly.[7]

- This happened tonight with my 2016 Jeep Compass with only 3600 miles on it. The passenger side deployed without provocation when

---

[6] *See* https://www.jeepgarage.org/threads/broken-active-headrest-ahr.105313/page-10

[7] *Id.*

12E4531

driving it down a residential street going approximately 15 mph. Fortunately, a passenger was not sitting in the passenger seat when it deployed. It appears that a plastic part broke, which caused the deployment. I have an appointment with the Jeep dealership on Friday. I am afraid to drive the vehicle now after reading articles about people suffering concussions from their Jeep headrest deploying without provocation. Apparently, there are several lawsuits pending regarding these defective headrests. SHAME ON JEEP FOR NOT REPLACING THESE HEADRESTS FREE OF CHARGE!!! THIS IS A SAFETY ISSUE CAUSED BY A DEFECTIVE PRODUCT.[8]

- My car was sitting in the sun one day and I came out and the driver side "tabs" were broken and the headset was popped. It is not fixable. The dealer wants $700 for just the headrest.[9]

- Pulled out of a parking lot last week in my 2014 GC and boom - driver's headrest popped out. Plastic tabs appear broken, and the dealer wants $994 to replace - not covered under a recall and out of warranty.[10]

- Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 09/15/2019: Driver seat headrest deployed while driving on smooth highway surface at 70 mph making a large noise and hitting hard the back of driver's head. There were no lights or indication of problems on the dash board. After I examined the headrest the plastic holding the metal bar had deteriorated so that the bar could not be placed back in its original spot, and the bar was found in the clamp below. The clamp was still locked. The headrest could not be reset since the plastic was broken.[11]

- Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 08/29/2019: At approximately 3:10pm on 8/29/19, the car was on and in park with the ac turned on, as my son in law was placing his 33-month baby in the car seat, located behind the drivers seat. My son in law sat down in the driver seat and was pulling his feet into the vehicle

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *See* http://www.carproblemzoo.com/chrysler/200/front-seat-head-restraint-problems.php

12E1745

when he heard a loud blast and felt the seat headrest explode against his neck and back. He states he may have blacked out for an undetermined time. [ ] He noted that the headrest was split apart.[12]

- Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 8/20/2019: On August 20th I noticed the headrest on the front passenger seat had deployed. The headrest mechanism deployed while the vehicle was parked. I noticed several small pieces of black plastic on the front passenger seat. Upon examining the headrest, I saw that the plastic which was supposed to hold a spring mechanism had failed.[13]

- Front Seat Head Restraint problem of the 2012 Chrysler 200 - Failure Date: 08/05/2019: Both of my headrests popped open for no reason. The passenger headrest happened two years ago and the drivers seat headrest happened this week. The vehicle was not involved in any type of collision or impact when the headrests popped open. I was driving smoothly on the road when they happened.[14]

- 2014 Town & Country - Head rest blew open with a loud bang driving on interstate on passenger side. The plastic inside that holds a metal rod broke. The rod was still seated in the trigger and appears to be caused by weak plastic used to hold the rod and head rest in position until collision sensor releases it. This is part of the air bag system and is to protect from whiplash in rear end collision. Car has 47,000 miles so is not under warranty but it seems it should be as it is part of the safety equipment.[15]

62.    Consumers have posted pictures of the broken AHR in their Class Vehicles.  Below is a photograph of an AHR showing the pin in place and the broken ABS plastic:[16]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15]    *See*    https://www.chryslerforum.com/forum/chrysler-voyager-town-country-21/broken-active-head-restraint-29755/

[16]    *See*    https://www.chryslerforum.com/forum/chrysler-voyager-town-country-



**Grammer and Chrysler Fail to Divulge the Defect**

63.     Grammer knew, before supplying its AHR product to Chrysler, that the

AHR was defective. Despite this knowledge, Grammer has continued to use inferior

and cheap plastic to manufacture the AHR bracket, and has neither addressed the

plastic bracket design defect, nor advised Plaintiff or the putative Class members

about the safety risk. As the manufacturer of the headrests with the defective AHR,

Grammer has, and has had for years, knowledge superior to consumers about the

quality of the plastic bracket in the AHR and should have known that buyers and

21/broken-active-head-restraint-29755/

owners of the Class Vehicles could not discover the defect before purchasing or leasing their Chrysler.

64.    Similarly, given the location of the AHR and its intended purpose, Grammer knew or should have known that such a malfunction could cause injury to drivers and passengers, and that an uncommanded deployment might cause a driver to lose control of his or her vehicle while driving, endangering not only the occupants of the vehicle, but other people on the road.

65.    Despite being aware of the AHR defect, and the risk of serious bodily injury or even death, Grammer has failed to notify owners of Class Vehicles of the defect, and has made no attempt to compensate Class Vehicle owners for the diminution in vehicle value.

66.    Grammer has intentionally taken no action to reveal the defect in the AHR, and instead concealed and failed to disclose the safety issue caused by the defective AHR components.

67.    When owners of Class vehicles report that their vehicle has experienced an uncommanded deployment, Chrysler orders replacement AHRs from a Grammer affiliate.  However, because Grammer has not addressed the defect, the replacement AHRs continue to present a safety defect for the vehicle owner; only now, the vehicle owner has not received the benefit of his bargain twice, as Chrysler forces the owner to pay out of pocket for a second defective AHR.

12E1745                                30

68.     Plaintiff Walton's experience with the defective AHR in his Chrysler is indicative of Chrysler's approach to the problem.

69.     In June 2020, Plaintiff Walton's passenger-side headrest deployed without warning, striking his teenage daughter on the back of the head. His daughter did not go to the hospital because of the COVID-19 pandemic, but experienced headaches, pain, and stiffness for days after the uncommanded deployment occurred.

70.     Mr. Walton took the vehicle to his local dealership but was told by the Chrysler representative that the headrest was broken and could not be reset. The Chrysler dealership subsequently told Mr. Walton that it was not covered by warranty and it would cost approximately $800.00 to replace the headrest.

71.     Photographs of Plaintiff Walton's headrest reveal that his AHR deployed due to the common uniform defect present in each of the Class Vehicles. As shown in the photographs of Plaintiff Walton's headrest below, the cheap plastic components of the AHR cracked and broke, thereby deploying the headrest even though the latch and pin remained in place:





72.    At all material times, the potential harm caused by the defective

material used in Chrysler's AHR system was known to Grammer. Grammer had superior and exclusive knowledge of the defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class members before they purchased or leased the Class Vehicles.

73.     Despite its awareness and actual knowledge of the defect in the design and materials of the AHR referenced herein and the attendant problems evidenced by, among other things, a significant number of customer complaints, repair orders, and warranty claims, Grammer continues to fail to warn, or even mention, anything about the issue.

74.     Despite Grammer's notice of the defect from its own investigations, communications with Chrysler, numerous consumer complaints, dealership repair orders, NHTSA complaints, warranty claims, the NHTSA investigation, and other sources, it refuses to admit that a defect is present, has not offered all consumers suitable repair, remedial measures, modifications, or replacements free of charge, and has not offered to reimburse the Class members who incurred costs relating to the defect and subsequent damage to the Class Vehicles. As a result of Grammer's conduct alleged herein, Plaintiff and absent class members have been harmed and have suffered actual damages as referenced herein.

**Plaintiff Has Been Damaged**

75.     As a result of Grammer's conduct in manufacturing and distributing

defective AHRs, and further in failing to disclose and actively and fraudulently concealing the defect, Plaintiff and the proposed Class members were harmed and suffered actual damages. The defective AHRs installed in the headrests diminish the value of the Class Vehicles.

76.     Plaintiff and the proposed Class members were deprived of the benefits of their bargains. The Chrysler vehicles they purchased or leased were of a lesser standard, grade, and quality than represented, and Plaintiff and the proposed Class members did not receive vehicles that met ordinary and reasonable consumer standards for safe and reliable operation.  Plaintiff and the proposed Class members paid more for their vehicles than they would have had Defendant disclosed the defective AHR, whether in monthly lease payments or through a higher purchase price.

77.     Grammer unjustly benefitted from putting a defective product on the market, and Plaintiff and absent Class members were deprived of safe, defect-free, components in their Class Vehicles.

78.     Plaintiff and absent Class members have also suffered out-of-pocket damages, including but not limited to loss-of-use expenses, paying for rental cars or other transportation arrangements, paying for diagnostic testing at repair facilities, and paying to replace headrests damaged by the uncommanded deployment of the AHR that neither Grammer nor Chrysler would cover.

79.    Plaintiff brings this action on behalf of himself and putative Class members to recover damages for their lost benefit of the bargain; out-of-pocket expenses, including repair costs due to the defective AHR; and to obtain an injunction requiring Grammer to repair and/or replace the defective AHRs and prevent any risk of future harm.

## IV.    TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

80.    Within the time period of any applicable statutes of limitation, Plaintiff and the proposed Class members could not have discovered, through the exercise of reasonable due diligence, that Grammer was concealing the defect in the headrests and misrepresenting the safety and reliability of the AHR contained in the headrests installed in Class Vehicles.

81.    Plaintiff and the proposed Class members have no way of knowing about the defect until the AHR in their vehicle spontaneously deploys. Even after a spontaneous deployment, Plaintiff and the proposed Class members had no ability to discover the actual nature of the defect—the use of the cheap plastic that is unable to withstand the constant force of the springs—because both Grammer and Chrysler failed to disclose and actively concealed the defect.

82.    For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

12E1745

**Fraudulent Concealment Tolling**

83.    All applicable statutes of limitation have also been tolled by Grammer's knowing and active fraudulent concealment and denial of the defect in the AHR throughout the time period relevant to this action.

84.    Grammer is under a continuing duty to disclose the true character, quality, and nature of the AHRs to the Plaintiff and the Class members.  Neither Chrysler nor Grammer disclosed information about the defective AHR, and instead, as discussed above, knowingly, affirmatively, or actively concealed such character.

85.    Grammer is under a continuing duty to disclose the defect in the AHR that it provided to Chrysler as it knew that its AHRs would be placed in the headrests installed in Class Vehicles and sold in the U.S. automotive market.

86.    Plaintiff and Class members reasonably relied upon Grammer's knowing, affirmative, or active concealment when they decided to purchase or lease Class Vehicles.

87.    Because Grammer actively concealed, and continues to actively conceal, the defect in the Class Vehicles, it is estopped from relying on any statutes of limitations defense.

# V.    CLASS ALLEGATIONS

## Class Definitions

88.    Plaintiff brings this action on his own behalf, and on behalf of all persons similarly situated, pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Plaintiff seeks to certify the following proposed nationwide class and state subclass:

> ### The Nationwide Class:
>
> All persons in the United States who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Chrysler, or any of its subsidiaries or affiliates, which are equipped with headrests containing the defective Grammer AHR.
>
> ### The Pennsylvania Subclass:
>
> All persons in Pennsylvania who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Chrysler, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective Grammer AHR.

89.    Excluded from each class are Grammer, Chrysler, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.  Also excluded are claims for any personal physical injuries

related to the AHR defect.

90.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

91.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**Numerosity**

92.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide equipped with headrests that have the defective AHR, including thousands in Pennsylvania.  Individual joinder of all Class members is impracticable.

93.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Chrysler's or their agents' and dealerships' books and records, as well as state vehicle registrations and sales records.  Plaintiff anticipates providing appropriate notice to each certified class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Commonality**

94.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and

23(b)(3) because there are questions of law and fact that are common to each of the

classes.  These common questions predominate over any questions affecting only

individual Class members. The predominating common or Class-wide fact questions

include, without limitation:

a.  Whether the inferior plastic that Grammer used in the AHR could withstand the force of the springs under normal operating conditions;

b.  Whether Grammer knew that the inferior plastic could not withstand the force of the springs under normal operating conditions;

c.  Whether there were other commercially viable plastic options to use in the manufacture of the AHR;

d.  Whether Grammer knowingly failed to disclose and warn consumers of the defect in the AHR;

e.  Whether Grammer had a duty to disclose to consumers material facts relating to the defect in the AHR and the safety risk it presents;

f.  Whether the headrest installed in the Class Vehicles is defective and a safety risk due to a defective AHR;

g.  Whether the Class Vehicles have suffered diminution of value as a result of containing headrests with the defective AHR;

h.  Whether Grammer engaged in unfair, unlawful and/or fraudulent acts or practices by failing to disclose that the headrests installed in Class Vehicles have defective AHR;

     i.   Whether Plaintiff and the class members suffered damages as a result of Grammer's refusal to replace the headrests or repair Class Vehicles after the AHR deploys due to the defect; and

     j.   Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**Typicality**

95.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct.  Each Class member purchased or leased a Class Vehicle with a defective AHR installed in the headrests and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff. The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

96.    Plaintiff will fairly and adequately protect the interests of the Class members.  Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

97.    To prosecute this case, Plaintiff has chosen the undersigned law firms, who have substantial experience in the prosecution of large and complex class action

litigation and have the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiff and his counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

98.      This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own the affected Class Vehicles.

99.      Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Grammer, by even a small fraction of the Class members, would be enormous.

100.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class

member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).

101.   Plaintiff is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

## Requirements of Fed. R. Civ. P. 23(b)(2)

102.   Grammer has acted or failed to act in a manner generally applicable to the members of the Nationwide Class and the Pennsylvania Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

12E1745                                         42

# VI.    CLAIMS FOR RELIEF

## COUNT I
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## ("UTPCPL"),  73 Pa. Stat. Ann. § 201-1, *et seq.*
## on behalf of the Pennsylvania Subclass

103.    Plaintiff incorporates by reference paragraphs 1 through 89 as though fully set forth herein.

104.    Plaintiff Walton and the members of the Pennsylvania Subclass are "person[s]" within the meaning of UTPCPL. 73 Pa. Stat. Ann. § 201-2(2).

105.    Grammer engages in "trade" and  "commerce" within the meaning of UTPCPL. 73 Pa. Stat. Ann. § 201-2(3).

106.    The UTPCPL prohibits "[u]nfair methods of competition" and "unfair or deceptive acts or practices," including  "any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. §§ 201-2, 201-3, 201-9.2.

107.    Grammer engaged in unfair and deceptive trade practices that violated UTPCPL, including failing to disclose a known safety defect which posed a risk of serious bodily injury, including death.

108.    Grammer knew that the ABS plastic used in the design of the would fail under normal use, and cause the AHR to spontaneously deploy, but failed to disclose the existence of this defect to consumers. Grammer knew that such

information was material to consumers, that the defect posed a threat of serious bodily injury transactions and vehicle safety, and that the defect could cause motor vehicle accidents resulting in injury or death.

109.   Grammer's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the defective AHR, created a likelihood of confusion or misunderstanding.  Grammer's conduct in placing defective AHRs into the stream of commerce, and its failure to disclose that the AHRs were defective and dangerous, led consumers to believe they were purchasing safe vehicles with AHRs that would add value to their purchases.

110.   Plaintiff and the members of the Pennsylvania Subclass justifiably relied on Grammer's conduct and omissions. Had Grammer disclosed the defect and warned consumers, the Subclass members would not have purchased Chrysler vehicles with the defective AHRs or would have paid less than they did.

111.   Grammer intentionally and knowingly omitted material facts regarding the Class Vehicles and the defective AHR installed in the headrests with an intent to mislead Plaintiff and members of the Pennsylvania Subclass.

112.   Plaintiff and the Pennsylvania Subclass members were, and continue to be, injured as a result of Grammer's conduct because they paid to own or lease a Class Vehicle without a safety defect in the headrests and instead received and overpaid for a vehicle containing the defective AHR.

12E1745                                                   44

113.   Grammer's failure to disclose the defective AHR system and the dangers and risks it posed were material to Plaintiff and the Pennsylvania Subclass members.  A safe vehicle is worth more than an otherwise comparable vehicle made of unsafe component parts.

114.   Plaintiff and the Pennsylvania Subclass members have suffered ascertainable losses as a result of Grammer's failure to disclose information about the defective AHR.  Had they been aware of the defect that existed in the headrests in Class Vehicles, Plaintiff and Pennsylvania Subclass members either would have paid less for their vehicles or would not have purchased or leased their vehicles. Plaintiff and the Pennsylvania Subclass members did not receive the benefits of their bargains due to Grammer's misconduct.

115.   As a direct and proximate result of Grammer's violations of UTPCPL, Plaintiff and the Pennsylvania Subclass members have suffered injury-in-fact and actual damages.

116.   Plaintiff and the Pennsylvania Subclass members are entitled to recover, under 73 Pa. Stat. Ann. 201-9.2, actual damages, treble damages  and attorneys' fees and costs, and hereby request that the Court award such relief, as well as any additional damages it deems just and proper.

**COUNT II**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.***
**on behalf of the Nationwide Class**

117.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

118.   Plaintiff brings this claim on behalf of all Class members.

119.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332(a)–(d).

120.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

121.   Plaintiff and the Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

122.   Grammer is a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

123.   The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is harmed by a warrantor's failure to comply with a written or implied warranty. 15 U.S.C. § 2310(d)(1).

124.   Grammer provided Plaintiff and other Class members with an implied warranty of merchantability in connection with the purchase or lease of their Class

Vehicles. As part of the implied warranty of merchantability, Grammer warranted that the headrests equipped with the AHRs were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed.

125.   Grammer breached this implied warranty, as detailed above, and is therefore liable to Plaintiff and the Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect: the AHR is made of an inadequate type of ABS plastic that fails under normal use.

126.   Any effort to limit the implied warranty in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

127.   Any limitations on the warranty are procedurally unconscionable because there was unequal bargaining power between Grammer, on one hand, and Plaintiff and Class members on the other.

**COUNT III**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**13 Pa. Stat. and Cons. Stat. Ann. § 2314**
**on behalf of the Pennsylvania Subclass**

128.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 89 as though fully set forth herein.

129.   In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Pennsylvania Subclass.

12E1745                                47

130.   Grammer is a "merchant" within the meaning of 13 Pa. Stat. and Cons. Stat. Ann. § 2314.

131.   Grammer impliedly warranted to Plaintiff and the Pennsylvania Subclass members that the Class Vehicles were merchantable within the meaning of 13 Pa. Stat. and Cons. Stat. Ann. § 2314.  However, the Class Vehicles do not have the qualities of safety and reliability that a buyer would reasonably expect and were therefore not merchantable due to the defective AHRs in the headrests.

132.   13 Pa. Stat. and Cons. Stat. Ann. § 2314 provides that "implied warranty of merchantability" means that consumer goods must:

(a) pass without objection in the trade under the contract description;

(b) in the case of fungible goods, be of fair average quality within the description;

(c) be fit for the ordinary purposes for which such goods are used;

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

(e) be adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

133.   The Class Vehicles and the headrests installed in them would not pass without objection in the automotive trade because the defective AHR deploys the headrest unexpectedly and at inappropriate times, posing a risk of serious injury to passengers and all other persons on the road.

12E1745
48

134.   Because of the defective AHR, the Class Vehicles are not safe to drive, which is in fact the ordinary purpose for which vehicles are intended.

135.   Thus, Grammer breached the implied warranty of merchantability because it manufactured and sold defective AHRs that deploy at random and risks serious injury to drivers, occupants, and others on the road.  In selling the defective AHRs without disclosing the existence or nature of the defect, Grammer deprived Plaintiff and the Pennsylvania subclass members the benefits of their bargains.

136.   Grammer's defective AHRs were unmerchantable at the time of sale. The defect was a latent design defect that was present in every unit at the point of sale.

137.   Plaintiff has provided notice of the defect to Grammer through its counsel.  Plaintiff's counsel advised Grammer's counsel in August 2020 of the defect's existence and that a suit was imminent. Plaintiff Walton also provided written pre-suit notice to Grammer's counsel on August 24, 2020.

138.   Grammer's breach of the implied warranty of merchantability directly and proximately caused Plaintiff and the Pennsylvania subclass members to overpay for goods whose dangerous and defective condition substantially impairs their actual value.

## COUNT IV
## UNJUST ENRICHMENT
## <u>on behalf of the Nationwide Class</u>

139.   Plaintiff re-alleges and incorporate by reference paragraphs 1 through 89 as though fully set forth herein.

140.   Grammer has received and retained a benefit from the Plaintiff and Class members and inequity has resulted.

141.   Plaintiff and the Class members overpaid for the Class Vehicles because they would not have purchased the Class Vehicles, or would have paid less, if Grammer had disclosed the defect in the AHR.

142.   Grammer benefitted through its unjust conduct by selling the defective AHR to Chrysler at a profit and for more than the defective AHRs were worth. Further, Grammer has benefitted through its unjust conduct in refusing to participate in a recall of the defective AHR and thereby saving the cost of a recall.

143.   It is inequitable for Grammer to retain these benefits. Grammer will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Grammer was unjustly enriched at his or her expense.

144.   Plaintiff does not have an adequate remedy at law.

145.   The amount of Grammer's unjust enrichment should be disgorged, in an amount to be proven at trial.

12E1745

146. Plaintiff, on behalf of himself and all similarly situated Class members, seeks an award against Grammer in the amount by which it has been unjustly enriched at Plaintiff's and the Class members' expense, and such other relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all other similarly situated Class members, request that the Court enter judgment against Grammer as follows:

1) Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiff as Class and Subclass representative and Plaintiff's chosen counsel as Class Counsel;

2) Declare that the AHR headrests installed in the Class Vehicles are defective;

3) Declare that Grammer is financially responsible for notifying all Class members about the defective AHR, issuing a recall for the AHR system, and replacing, at its cost, the headrests installed in the Class Vehicles with headrests that do not have a defective AHR;

4) Declare that Grammer must disgorge, for the benefit of Plaintiff and the Class members, all or part of the ill-gotten gains they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class members;

12E1745

51

5)      Award Plaintiff and Class members actual, compensatory, and treble damages, including interest, in an amount to be proven at trial under the applicable claims;

6)      Award Plaintiff and Class members their reasonable attorneys' fees and costs, as allowed by law;

7)      Award Plaintiff and Class members pre-judgment and post-judgment interest as provided by law; and

8)      Award Plaintiff and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Respectfully submitted August 26, 2020.

<u>s/ Paul F. Novak</u>
**WEITZ & LUXENBERG, P.C.**
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Tel: (313) 800-4170
Email: <u>Pnovak@weitzlux.com</u>
P39524

Benjamin Widlanski, Esq.
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
(Admission Application Forthcoming)
<u>bwidlanski@kttlaw.com</u>
Florida Bar No. 1010644

12E1745

52

Tiffany Ellis
**WEITZ & LUXENBERG, P.C.**
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Tel: (313) 800-4170
Email: tellis@weitzlux.com
P81456

*Co-Counsel for Plaintiff*

Robert J. Neary, Esq.
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
(Admission Application Forthcoming)
rn@kttlaw.com
Florida Bar No. 81712

*Co-Counsel for Plaintiff*

Peter Prieto, Esq.
**PODHURST ORSECK, P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2700
Miami, Florida 33131
Tel: 305-358-2800
Fax: 305-358-2382
pprieto@podhurst.com
(Admission Application Forthcoming)
Florida Bar No. 501492

*Co-Counsel for Plaintiff*